ETHAN R. PLAUT
Assistant U.S. Attorney
U.S. Attorney's Office
P.O. Box 3447
Great Falls, MT 59403
119 First Ave. N., Suite 300
Great Falls, MT  59401
Phone:  (406) 761-7715
Fax:  (406) 453-9973
E-mail: ethan.plaut@usdoj.gov

ERIC N. PEFFLEY
Trial Attorney
Criminal Section
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
Phone (202) 353-5173
E-mail: Eric.Peffley@usdoj.gov

ATTORNEYS FOR PLAINTIFF
UNITED STATES OF AMERICA

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MONTANA
HELENA DIVISION

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN RUSSELL HOWALD,<br><br>Defendant. | CR 21-04-H-BMM<br><br>**UNITED STATES' SENTENCING MEMORANDUM** |
|---|---|

The United States of America, by and through Ethan R. Plaut, Assistant U.S. Attorney for the District of Montana, and Eric N. Peffley, Trial Attorney with the Civil Rights Division of the United States Department of Justice, provides the Court with this memorandum in aid of sentencing the defendant.

## INTRODUCTION

On March 22, 2020, Howald set out on a self-described mission to rid Basin of its lesbian, queer, and gay community. He had plenty of weapons and ammunition to do exactly that: On his person, and in his hands, he carried two assault rifles, a hunting rifle, two pistols, and multiple high-capacity magazines taped together to speed up reloading. He walked first to K.J.'s house, firing bullets into her property and residence, all because of his belief regarding her sexual orientation. Hoping he had killed her, he set off for his next victims. Local residents, who knew Howald, happened to be coming out of church and intervened, stalling him long enough for Jefferson County Sheriff's Office (JSCO) Deputy Shaun Gardner to respond. When Gardner arrived, Howald pointed an assault rifle at the deputy, nearly started a shootout in downtown Basin, and fled into the hills, firing off at least one more round as he went. This was a targeted mass shooting, prevented only by good fortune and heroics of residents and law enforcement.

After a four-day trial, Howald was convicted of both counts in the superseding indictment, Count 1 being a hate crime that included an enhancement

for attempting to kill K.J., and Count 2 being a firearms conviction for discharging a firearm during the hate crime.

The government recommends a guideline sentence on Count 1, with a 10-year mandatory minimum consecutive sentence on Count 2. The government further recommends a 5-year guideline term of supervised release, concurrent on each count. The government also recommends a $100 special assessment per count. The Government's proposed sentence would reflect the gravity of Howald's offenses as well as his alarming criminal history. It would be sufficient but not greater than necessary to accomplish the sentencing considerations set forth in 18 U.S.C. § 3553(a).

## THE PSR'S GUIDELINE SENTENCE CALCULATION

The final Presentence Investigation Report (PSR) calculates Howald's base offense level on Count 1 as 33. PSR ¶ 36. It applies a 3-point enhancement for selecting the victims based on their actual or perceived sexual orientation, PSR ¶ 38, as well as a 2-point enhancement for reckless endangerment during flight, PSR ¶ 40, for a total offense level of 38 for Count 1. PSR ¶ 42. The defendant is criminal history category III. PSR ¶ 56. His guideline term of imprisonment is therefore 292-365 months on Count 1. For Count 2, there is a mandatory minimum term of imprisonment of 120 months, consecutive to any other sentence, which is also the guideline term of imprisonment. PSR ¶¶ 35, 89.

The guideline term of supervised release is two to five years on both counts, with the terms to run concurrently.  PSR ¶¶ 92-94. There is a mandatory $100 special assessment on each count of conviction, PSR ¶ 98, and a maximum fine on each count of $250,000, with a guidelines fine range of $5,500 to $55,000.  PSR ¶¶ 97, 99.

## OUTSTANDING OBJECTIONS TO THE PSR

The government has no objections to the final PSR. The government anticipates two defense objections, which will be addressed in turn:[1]

1. *The PSR Correctly Calculates the Count 1 Base Offense Level*

The guideline for Count 1 is USSG §2H1.1.  That provision instructs the Court to "Apply the Greatest" of several options, one of which is: "the offense level from the offense guideline applicable to any underlying offense." USSG §2H1.1(a)(1). The commentary explains that cross reference is to "the offense guideline applicable to any conduct established by the offense of conviction that constitutes an offense under federal, state, or local law."  USSG § 2H1.1 App. Note 1. As explained in the PSR, the jury in this case specifically found that Howald's hate crime included an attempt to kill victim K.J. The jury instruction on that

---

[1] Howald did not object to the draft PSR's inclusion of the 3-level upward adjustment under U.S.S.G. § 3A1.1(a) for intentionally selecting lesbian and gay individuals as the victims of his offense. Accordingly, the government believes that the defendant concedes its applicability in the final PSR as well and will not address that enhancement herein.

4

enhancement mirrored the Ninth Circuit attempted murder instruction. (Doc. 138 at 19). Therefore, the "guideline applicable to any conduct established by the offense of conviction" on these facts is indeed USSG §2A2.1, the guideline provision for attempted murder. Howald carried out his offense in such a fashion that the "object of the offense would have constituted first degree murder." USSG. §2A2.1(a)(1), *see also* 18 U.S.C. § 1111 (incorporating into murder in the first degree "any other kind of *willful*, deliberate, malicious, and premeditated killing") (emphasis added). The offense level for attempted murder is therefore 33 under §2A2.1(a)(1). That is greater than the otherwise applicable U.S.S.G. §2H1.1 base offense level. Accordingly, under the guidelines' plain language, the proper base offense level is 33.

Case law confirms that the PSR correctly applies the plain language of the guidelines and, therefore, this cross-reference. *See United States v. Allen*, 341 F.3d 870, 897 (9th Cir. 2003) (district court correctly applied the base offense level for aggravated assault, and also applicable weapons enhancements for aggravated assault, in a race-motivated hate crime case, since "the defendants' offenses involved confronting racial minorities in a public park, threatening them with weapons, and chasing them while yelling racial slurs or threats, conduct similar to aggravated assault*"); see also United States v. McInnis*, 976 F.2d 1226 (9th Cir. 1992) (district court erred in not applying the higher aggravated assault offense

level in a race-motivated interference with housing rights case, where a defendant shot into a neighbor's home but was not alleged to have intended to kill).

Common sense confirms that the cross-reference should be applied on these facts. Were the cross-reference inapplicable, the base offense level would be 10. USSG §2H1.1(a)(3). Assuming the PSR's other enhancements applied, that would lead to a total offense level of 15 and a guideline range on Count 1 of 24-30 months. The guideline range would the same if Howald had tried to slap a victim in the face, instead of trying to kill K.J. with an assault rifle. Moreover, attempts to kill under a statue not involving bias—in Indian Country, for example—would have a base offense level of 33, while attempting to kill someone because of a protected characteristic such as race, gender, or sexual orientation, etc. would trigger a base offense level 23 levels lower. In other words, without the cross-reference, *adding* a bias motivation to a violent crime would dramatically *decrease* culpability under the guidelines, a result that cannot be squared with common sense or the guidelines' plain language.

Were this Court to decline to apply the cross-reference, it would also lead to a guideline calculation dramatically out of line with other cases. These cases are summarized below, in regard to the § 3553(a) factors, but also confirm that courts have indeed applied the plain language and common sense to cross-reference the attempted murder guideline on analogous facts.

6

### 2. *The PSR Correctly Applies the Reckless Endangerment Enhancement*

"If the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, increase by 2 levels." U.S.S.G. §3C1.2. Application Note 3 defines "During flight . . . broadly" to include "preparation for flight[,]" and explains that the enhancement should be applied "where the conduct occurs in the course of resisting arrest."

In this case, several facts trigger the enhancement. First, when confronted by JSCO Deputy Gardner, Howald refused to put his weapons down as ordered, and instead pointed his rifle at the officer—the very rifle he had fired moments before into K.J.'s property and home and several more times in the middle of Basin Street. Pointing a loaded assault rifle at an officer, while standing next to R.H. and S.H., without a doubt creates a substantial risk of death or serious bodily injury to others, triggering the enhancement. *See, e.g., United States v. Lenihan*, 238 F. App'x 198, 199 (9th Cir. 2007) (enhancement applied where defendant fled at 60 MPH in vehicle and pointed firearm at pursuing officers); *United States v. Chavez*, 350 F. App'x 150, 150-151 (9th Cir. 2009) (applied where defendant fled into a store while carrying a loaded firearm and disposed of it near employees and customers); *United States v. Caraway*, 398 F. App'x 316, 317 (9th Cir. 2010) (enhancement would have been appropriate for "gratuitously point[ing] a gun at the police during

7

his flight" but he had already received a higher 6-point enhancement for the same conduct under Official Victim enhancement).

Second, R.H. and S.H. testified that Howald fired at least one more round as he fled from Deputy Gardner. Likewise, Deputy Gardner testified that he heard another gunshot after he lost sight of Howald. Shooting as he was fleeing under these circumstances, even if into the ground, risked serious bodily injury from the rounds themselves, or from causing the officer to fire, recklessly causing a shootout.[2]

## SENTENCING FRAMEWORK

The Court is required to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the sentencing guidelines and policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims. 18 U.S.C. § 3553(a)(1), (3)-(7). Although the Sentencing Guidelines are no longer mandatory, they should be "the starting point and the initial benchmark" in determining an appropriate sentence. *Gall v. United States*, 552 U.S. 38, 50 (2007).

---

[2] Application Note 6 adds that "an upward departure may be warranted" if "the conduct posed a substantial risk of death or bodily injury to more than one person[.]" While not in the PSR, the government's position is that the Court would have clear authority for an upward departure given the number of people the defendant put at risk when he nearly caused a shootout in downtown Basin. *See also U.S.S.G. § 5K2.0(a)*.

18 U.S.C. § 3553(a)(2) requires the Court to "impose a sentence sufficient, but not greater than necessary" to comply with the following purposes: (1) to reflect the seriousness of the offense; (2) to promote respect for the law; (3) to provide just punishment for the offense; (4) to afford adequate deterrence to criminal conduct; (5) to protect the public from further crimes of the defendant; and (6) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

## SENTENCING RECOMMENDATION

With the above factors in mind, the United States recommends the Court impose a guideline term of imprisonment on Count 1 and a consecutive 120-months imprisonment for Count 2, followed by 5 years of supervised release, and a $100 special assessment per count. The government has not received any restitution requests from a victim at this time but reserves the right to request restitution at sentencing. The government's recommended sentence is warranted by the sentencing factors, in particular, the seriousness of the nature and circumstances of Howald's offense, the need for just punishment, and the need to protect the public from the defendant.

I.   *18 U.S.C. § 3553(a)(1) Considerations*

- **Nature and Circumstances of the Offense**

The jury in this case determined beyond reasonable doubt that Howald attempted a targeted mass shooting, a mass shooting that was only avoided by good fortune, the intervention of local residents, and a timely response by law enforcement.

Howald approached K.J.'s residence and, because of her sexual orientation, he fired one of his assault rifles repeatedly at her property. One round traveled through an exterior wall, across her sewing room, through an interior wall, bounced off the ceiling of her kitchen, and finally lodged in the kitchen wall. K.J. was just a few feet away, taking a shower. Hopeful that he had killed K.J., Howald was not done. He walked west, headed towards several other houses occupied by people who identify—and were known to Howald per his trial testimony—as lesbian, queer, or gay. Residents who recognized Howald intervened, stalling him and inadvertently recording several minutes of Howald yelling and firing off more rounds with the same rifle, expressing his hatred towards the gay and lesbian people of Basin and his determination to "clean" them from his town. He doubled down on his goal to continue "cleaning house" of the "sickness" by "killing them motherfuckers." He yelled other expletives to R.H., S.H., and F.O. about the gay and lesbian Basin residents, after having already shot at least 11 rounds from an

AK-style rifle into K.J.'s property and home. He fired off 5 more rounds in the middle of town as he was arguing with those who tried to get him to back down. Despite their best efforts, Howald maintained his resolve to kill while standing only about a block away from where numerous other LGBTQ+ community members were going about their Sunday. Two of those members, M.K. and B.H. were outside at the time, unaware of the deadly threat a stone's throw away.

When JCSO Deputy Gardner arrived and ordered Howald to put his guns down, Howald refused, pointed his AK-style rifle at the deputy, and demanded that the deputy instead put his gun down. Howald fled on foot into the wooded hills around Basin, firing at least one more shot as he went. He evaded law-enforcement for a day, hiding his AK rifle under the mattress of his camper. When he was again confronted the next day by JSCO officials, Howald disregarded orders while carrying a pistol and a knife on his hip, again nearly causing law enforcement to open fire, and then almost pulled those officers with him as he attempted to jump off the hill into the creek below.

No one was physically hurt, but only because of luck and the brave actions of local residents and Deputy Gardner. If R.H., S.H., and F.O. had not been able to stall him just long enough, and if Deputy Gardner had not arrived promptly and confronted Howald, this case would have devolved into the horrific mass shooting that Howald intended to carry out.

In addition, the lack of physical injury notwithstanding, Howald's actions that day caused real, tangible harm to numerous people who had done him no wrong. He almost killed K.J.—the bullet that ripped through multiple walls in her home, traveled across several rooms from the front to the back of her house and lodged itself in her kitchen wall almost struck her as she was taking a shower. He attempted to kill and injure numerous other women who had been in the town for decades, simply because of his beliefs about their sexual orientation. On top of all this, he wanted to "start a fuckin revolution," spurring on similar attacks elsewhere throughout the county. Such an attack on a specific category of citizens, with such explicitly stated goals of unprovoked local and national violence, generates fear and instability for the entire LGBTQ+ community.

- **History and Characteristics of the Defendant**

While the present offense is the most egregious conduct Howald has engaged in, his history and characteristics are troubling and show that his attack on the LGBTQ+ community in Basin is, unfortunately, not the first time he has lashed out in violence. Howald's criminal history began at age 17 in Missouri. PSR ¶ 45. He committed his first assault at age 18 in Missouri, and his second at age 26 in Montana. PSR ¶¶ 47, 51. Next, in 2005, a family was camping at the Ladysmith Campground in Montana when their golden retriever, Gunner, wandered into the defendant's campsite. He shot the animal twice and beheaded it with a chainsaw.

Then he drove to the family's campsite, threw the severed head into their site, and yelled an expletive at them. PSR ¶ 52. According to reports in that case, Howald took these actions "calm[ly]" and was not "bothered by the turn of events in any way whatsoever." *Id.*

The callousness with which Howald took such disturbingly violent actions—particularly when viewed in light of his conduct in the instant case—is greatly concerning, indicative of deep and longstanding violent tendencies. Howald also has a substance abuse issue, which further exacerbates the risk he poses to others.

- **18 U.S.C. § 3553(a)(3)-(7)**

The maximum penalties are summarized in the PSR and include up to life imprisonment. The guidelines are as stated above. As of this filing, no restitution has been requested. As to "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," the government is not aware of any factually analogous case that has been sentenced in this district. Nor could the government identify any other case involving an attempted—but unsuccessful—mass shooting that targeted a class of people due to a protected characteristic, such as race or sexual orientation. However, the government submits the following summary information for the Court's reference. The following cases all involved hate crime convictions with the enhancement for an attempt to kill, and all involved a base offense level set at 33.

Unlike Howald—who downplayed his actions at trial and even testified (despite the recording) that his actions had nothing to do with the sexual orientation of K.J. or any other person—these defendants accepted responsibility, received the resulting guideline adjustment, and entered plea agreements:

| Caption | Factual Summary | Imprisonment |
| --- | --- | --- |
| *United States v. Malachi Robinson*, 4:21-CR-193 (W. Dist. MO) (Ex. 1)[3] | Defendant shot a minor victim because of sexual orientation, causing serious bodily injury. Charged with 18 U.S.C. §249(a)(2) and an 18 U.S.C. § 924(c) charge that was dismissed at sentencing pursuant to plea agreement. CH Category I. | 262 months on the hate crime |
| *United States v. Larry Foxworth*, L22-CR-176-MHC (N. Dist. GA) (Ex. 2) | Defendant shot into two stores hoping to kill Black or Arab people. Pleaded to one hate crime count and one 18 U.S.C.§ 924(c) count pursuant to a Rule 11(c)(1)(C) agreement. Final offense level of 33 and CH Category IV | 110 months on hate crime and 120 months consecutive on firearm offense |
| *United States v. Nicole Franklin*, 4:21-CR-70-SMR (S. Dist. IA) (Ex. 3) | Defendant attempted to kill two minor victims because of their race and national origin, causing bodily injury. Pleaded guilty to two hate crime counts. CH Category IV. No firearms involved. | 304 months imprisonment per count, concurrent. |

II. *18 U.S.C. § 3553(a)(2) Sentencing Purposes*

A guidelines sentence of imprisonment on Count 1, followed by the mandatory 120-month consecutive sentence on Count 2, would reflect the

---

[3] For each case, the government has attached the government sentencing memo and judgment.

seriousness of the offense, promote respect for the law, and provide just punishment for the defendant's conduct. This sentence would also provide deterrence against this type of violence in the future, both by Howald and other likeminded people, thereby protecting the public from further crimes.

- **Seriousness of the Offense**

A guideline sentence would reflect the seriousness of the defendant's conduct. As described above, the nature and circumstances of the offense are horrific, both in terms of the actual harm caused to K.J. and the LGBTQ+ community in Basin, and the broader societal harm. The offense was a targeted mass shooting that was interrupted. If successful, Howald would have eliminated an entire class of people from a Montana town and caused LGBTQ+ individuals across the country to fear for their safety.

Victims in this case, including K.J., described at trial the trauma and fear they experienced that day and in the days that followed. K.J. recounted thinking about how close she was to being shot and killed in her own home, and that she left the holes in her walls unrepaired as a reminder about how lucky she was to be alive. J.L. described the sleepless, fearful night before Howald was arrested, knowing that someone who was trying to kill the lesbians and gays in the town was on the loose, and that Howald's actions that day are part of the reason she is now leaving Basin behind altogether. M.K. shared the terror she felt seeing the armed

man just on the other side of the creek from where she and her partner, B.H., were outside chopping wood, even while—in the moment—she had not understood the scope or nature of Howald's attack, nor the fact that her own sexual orientation meant she was potentially in his sights.

- **Just Punishment & Respect for the Law**

As explained above, the defendant's conduct was extremely serious, and indicates a complete disregard for the law. It is difficult to quantify how damaging an attempted assault on an entire class of people is to those in Basin, and around the country. It is incalculable how much of a risk the defendant presented on March 22, 2020, not only to those he was explicitly trying to shoot and kill, but even to those who he was claiming to protect—shooting rounds off in the middle of Basin on a Sunday afternoon.

Even after all of the damage he caused, and the overwhelming evidence establishing his guilt, Howald still has not accepted responsibility for his actions. *See* PSR ¶ 33. At trial, despite the evidence showing the consistent trajectory of bullets aimed right at—and into—K.J.'s house, Howald testified under oath that he merely shot aimlessly down the street. And despite his unequivocal words captured on recording, he claimed he did not intend to harm anyone because of their sexual orientation. A guideline sentence would provide just punishment,

16

given the seriousness of the defendant's conduct, and send a message that the law must be respected.

- **Deterrence & Protection of the Public**

A guidelines sentence will accomplish the dual objectives of specific and general deterrence. Howald will be incarcerated for a considerable amount of time, preventing him from being in any position to harm those in the LGBTQ+ community and the broader public. The severity of his sentence—matching the severity of his crime—will also provide a significant deterrent impact on Howald, discouraging him from lashing out in violence ever again. It will also send a clear message that such bias motivated violence will not be tolerated in this country, and that any likeminded individuals who might consider joining Howald's "revolution" will only meet similar, appropriately strict punishment.

- **Training, Care and Treatment of the Defendant**

Finally, five years of supervised release is appropriate to allow the Court to ensure that the defendant makes a reasonable transition to becoming a productive member of society upon completion of his term of imprisonment and has the support he needs to avoid falling back into substance abuse or criminal activity.

## CONCLUSION

In sum, the totality of Howald's actions on March 22, 2020, must be met with steep, yet just, punishment. The government's recommended sentence accomplishes this goal without being greater than necessary to comply with the sentencing purposes. Based on the foregoing, the United States respectfully recommends a guideline term of imprisonment on Count 1, a consecutive 120-month sentence on Count 2, five years of supervised release on both counts, and a special assessment of $100 per count.

DATED this 31st day of May 2023.

JESSE A. LASLOVICH
United States Attorney

*/s/  Ethan R. Plaut*
ETHAN R. PLAUT
Assistant U.S. Attorney

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

*/s/  Eric N. Peffley*
ERIC N. PEFFLEY
Trial Attorney
Civil Rights Division

## CERTIFICATE OF COMPLIANCE

Pursuant to D. Mont. L.R. 7.1(d)(2) and CR 47.2, the body of the attached memorandum is proportionately spaced, has a typeface of 14 points or more, and the body contains less than 6500 words, excluding the caption and certificate of compliance.

*/s/  Ethan R. Plaut*
ETHAN R. PLAUT
Assistant U.S. Attorney