Colin M. Stephens
Nick K. Brooke
STEPHENS BROOKE, P.C.
315 W. Pine
Missoula, MT 59802
Phone:  (406) 721-0300
colin@stephensbrooke.com
nick@stephensbrooke.com

*Attorneys for Defendant*

## In the United States District Court
## District of Montana
## Helena Division

| United States of America, | Cause No CR 21-04-H-BMM |
|---|---|
| Plaintiff, | |
| -vs- | **Defendant's Sentencing Memorandum** |
| John Russell Howald, | |
| Defendant. | |

## Introduction

John Russell Howald submits the following sentencing

memorandum.  At sentencing, Howald will be requesting the Court

impose a sentence of 1 day on Count 1 followed by a consecutive

mandatory minimum sentence of 10 years on Count 2.  As set forth in

this memorandum, such a sentence is authorized by *Dean v. United States*, 581 U.S. 62 (2017) and is consistent with the Court's sentencing obligations set forth in *18 U.S.C. § 3533(a)*. Howald will also ask the Court run its sentence concurrent with the sentences Howald received in Jefferson County District Court, DC-2020-15, with a sentencing variance to reflect the total length of that sentence.

First, this memorandum will address Howald's objections to the current Presentence Investigation Report (PSR). Second, the memorandum will address the requested sentence and the *§ 3553(a)* factors.

## I.  Objections

Howald's original total offense level was 13 which, coupled with his criminal history, resulted in an advisory guideline range of 18-24 months. Howald did not object to this calculation. (Addendum pg. 3). The Government had many objections. The Addendum to the final PSR indicates "[t]he defendant does not have any objection to the current Presentence Report as written by the United States Probation." (Id.) At the time, the "current" report was the draft. Now, Howald objects to

the advisory guideline range of 292-365 months, which results from a total adjusted offense level 38 and a criminal history category of III.

## Objection 1

Howald does not dispute that Olive "Katy" James is a "victim" as defined by the guidelines.  Other individuals identified in paragraph 31 are not victims, however.  As authority, Howald would point to the Guideline Commentary to *§ 3D1.2*, note 2, which indicates that "[t]he term 'victim' is not intended to include indirect or secondary victims. Generally, there will be one person who is directly and most seriously affected by the offense and is therefore identifiable as the victim."  In this instance, that individual is Ms. James.  Howald agrees Ms. James is entitled to appropriate restitution, if requested.  (Addendum, pg. 3).

All others would qualify as individuals either indirectly or secondarily affected by the offense of conviction.

## Objection 2

Howald objects to the application of the cross-reference from *§ 2H1.1* to *§ 2A2.1*.  (PSR, ¶ 36).  Howald was neither charged nor convicted of an offense under *18 U.S.C. § 1111*.  The more appropriate

guideline to apply in this instance would be the "Hate Crime Motivation" under *§ 3A1.1(a)*. That guideline reads, in relevant part, "[i]f the finder of fact at trial . . . the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of actual or perceived . . . sexual orientation of any person, increase by 3 levels." The Court of Appeals for the Ninth Circuit has approved the use of this enhancement in a case involving a racially motivated assault against an African American man. *United States v. Armstrong*, 620 F.3d 1172 (9th Cir. 2010). The Ninth Circuit was persuaded by a similar decision from the Court of Appeals for the Tenth Circuit*, United States v. Woodlee*, 136 F.3d 1399 (10th Cir. 1998). *Armstrong*, 620 F.3d at 1176 (discussing *Woodlee*).

The Commentary to the Hate Crime adjustment in *§ 3A1.1*, specifically provides that subsection (a) "applies to offenses that are hate crimes." That would be precisely Howald's case and the offense of which he was convicted. Notwithstanding the jury's finding that Howald's conduct included an attempt to kill Katy James, Howald

remains convicted of a hate crime under *18 U.S.C. § 249(a)(2)*.

Comment Note 5 to *§ 3A1.1* highlight's the Commission's purpose in

having this specific enhancement apply to offenses such as Howald's.

"For the purposes of this guideline, 'gender identity" means actual or

perceived gender-related characteristics. *See 18 U.S.C. § 249(c)(4)*."

*U.S.S.G. § 3A1.1,* Commentary Note 5.   Although sexual orientation is

not included in that note, logic dictates that reference to *§249(c)* would

also include sexual orientation as well.

Further, the "Background" commentary to the Guideline

specifically indicates the purpose of the upwards adjustment was "[t]o

avoid unwarranted sentence disparity based on the method of

conviction . . . ." *§ 311.1* (Commentary, Background).

With the application of the 3-level "Hate Crime Motivation"

enhancement, Howald's advisory guideline range is correctly calculated

as a Level 13.  This results from a Base Offense Level 10 from *U.S.S.G.*

*§ 2H1.1*, and the addition of the 3-level enhancement from *§ 3A1.1(a)*.

## **Objection 3**

Howald objects to the 2 level enhancement under *§ 3C1.2*.

-5-

(Paragraph 38).  Realistically, the Court is in the best position to know that this enhancement is inappropriate given the facts presented at trial, especially pertaining to Pastor Floyd Oliver, and Ron and Stacy Hale.  The enhancement speaks of a "substantial risk of death or serious bodily injury."  The testimony at trial and the recording introduced into evidence demonstrates that no individual present perceived a "substantial risk" of even serious bodily injury when Howald discharged his firearm during the encounter in town.

As for Howald having to be tasered during his arrest, the only substantial risk in that instance was to Howald.  That he did not immediately comply with the commands of law enforcement, this does not give rise to a "substantial risk of death or serious bodily injury." Therefore, Howald objects to the 2-level enhancement set forth in Paragraph 38.

Howald's being tasered while arrested does not compare to the cases cited by the Government on page 3 of the Addendum.  The officers were not in a substantial risk of death or serious bodily injury as a result of Howald pulling away toward the embankment.  Even if

Howald concedes such conduct was reckless, the enhancement does not punish recklessness alone, it punishes a recklessness that creates a "substantial risk of death or serious bodily injury." That is not the case here as the evidence at trial showed.

Given these objections, the appropriate advisory guideline range is the one originally calculated by the Probation Office in the Draft PSI, 18-24 months. (Paragraph 90).

**<u>Objection 4</u>**

Howald would object to the recommendation in Paragraph 112, that he comply with all child support obligations and/or pay child support as ordered. All of Howald's children are grown and he is not obliged to pay child support.

## II.  The Sentence

This Court is well aware of its obligations under *§ 3553(a)* and had the opportunity to review all of the evidence at trial, including Howald's sworn testimony. In light of both, a sentence of ten years and one day is sufficient to effectuate the edicts of *§ 3353(a)* and impose a sentence that is sufficient but not greater than necessary.

The evidence at trial showed that, at the time of the offense, Howald was suffering deep emotional trauma, that he was very drunk, and that he had long struggled with his own sexuality. Howald previously worked for Katy James. Up until March 22, 2020, Howald had peacefully co-existed with the gay and lesbian community in Basin for decades. Whatever this Court may think of him, Howald is not Omar Maateen, who killed 49 people and wounded 52 more at a gay nightclub. At his core, Howald is not a crusading bigot, who is hell bent for leather on wiping lesbians from the Earth. The Court heard what he said that day, but the context of Howald's words matter as much as the actions that accompany them.

This is not to excuse the offense of conviction, but the Court is obligated to consider the nature and circumstances of the offense. The Court will recall that Ms. James did not know Howald had shot her house until hours after the fact. Further, Ms. James did not know the alleged motivation behind the shooting until she was told by others. That motivation came solely from Howald's drunken rant recorded by Pastor Floyd Oliver.

That recording played a critical role at trial and will continue to play a critical role at sentencing.  For, while it speaks of motive, it also provides insight into Howald's extreme distress and intoxication. Every witness who knew Howald testified to the effects of alcohol on Howald's personality.  He was a quiet, pleasant man who was eager to lend a hand without the use of alcohol.  When intoxicated, he was largely unrecognizable to them.  A large number of witnesses told both the Court and Government investigators that they recognized that Howald needs treatment and counseling.  Howald even told this Court how much he drank and how his grandfather's death affected his mindset at the time.

Again, neither alcohol nor his own mental health issues excuse  or minimize the severity of the offense or its effect on Ms. James, but the Court would be remiss to not consider either as part of the sentencing factors in this matter.

Howald faces a mandatory minimum sentence of ten years on Count 2.  He will be requesting the Court recommend him for RDAP. Howald recognizes that 100% of his past run-ins with the law have

been the direct result of his alcohol use.  He also recognizes that alcohol only compounds mental health issues he struggles with and any relief it offers is either temporary or illusory.  A sentence of ten years followed by one-day on Count 1 is sufficient but not greater than necessary to ensure Howald is able to obtain the necessary treatment and meet his medical needs.

The requested sentence is also sufficient to provide just punishment.  As noted in the Addendum to the PSR, there is insufficient data to determine a non-disparate sentence.  This must surely be in part because every hate crime is individually unique and, for many reasons, the perpetrators cannot always be charged.  In the Pulse shooting case, for example, the perpetrator took his own life. Dylan Roof, a white supremacist convicted of killing nine African Americans in Charleston, was sentenced to nine consecutive life sentences in state court and a death sentence in federal court.  The father and son convicted of murdering Ahmaud Arbery were given life sentences, and the neighbor who assisted them received a sentence of 35 years.  Both as a person and in his actions, Howald is a far cry from

any of these other individuals.  Thankfully, Howald's actions did not result in death or even physical injury to anyone.

In addition to Howald's testimony, the Court will have likely seen Howald cry with remorse and shame during several points in the trial, including when the tape was played, during his daughters' testimony, and throughout Stacy Hale's testimony.  The undersigned can affirm that at several points during pretrial meetings, Howald would cry when listening to the tape and repeat:  "That's not me.  That's not  who I am."

The attached letters provide the Court insight into the history that formed Howald's personal history and characteristics.  Howald's paternal grandmother provides a detailed family and personal history that is strikingly sad.  She openly acknowledges Howald's difficult childhood at the hands of her own son.  She understands that Howald was failed by both his parents and, worse, suffered severe abuse and was exposed to extreme dysfunction.  Howald was a victim of sex abuse at age, 4, was introduced by his own mother to  drugs and alcohol at age 10, and suffered molestation again at the age of 12 at the hands of an older cousin.  His father, who married eleven times and tasked eight

different stepmothers with Howald's upbringing, severely physically abused Howald and threatened him with guns. In light of the information provided by Howald's grandmother and his aunts, it is not surprising that Howald turned to alcohol and had his own relationship struggles. What is surprising perhaps is that anyone has anything good to say about Howald at all.

Many people, even the Government's own trial witnesses, speak to Howald's fundamental, underlying decency. It is a decency that provided the extraordinary courage and compassion to Stacy Hale and Ron Hale that day in March. The Court heard from Ron Hale, who saw Howald in obvious distress. Based on his relationship with Howald and notwithstanding the fact that Howald was both armed and drunk, Ron stopped his vehicle to see what was wrong. He calmly counseled and supported Howald even after hearing Howald's preposterous ramblings and seeing him angrily fire rounds into the ground.

Like Ron, Stacy relied on her previous knowledge of Howald's character and decency to leave the safety of the car and hug Howald. At trial, Stacy described a "friend out on the road in a bad way" who

came toward her with his arms open.  As opposed to the man she knew who would quietly sit at a café and read the paper, Howald was sobbing and claiming he was the devil and this world was his creation.   Howald rambled about quite a few years of events that were causing him great distress, and Stacy noted that he seemed to grow more disturbed recounting that history.  She recalled him firing the gun right next to her in no particular direction and then Howald lamenting that despite firing guns in town, no law enforcement had come to put a stop to it. Still, she showed extreme courage and compassion in remaining there to help him.  She even went as far to say that she was willing to grab him and tumble him over herself to save Howald from being hurt.

Ms. Hale's testimony was some of the most striking the undersigned has witnessed in any trial.  Not because it was so filled with emotion but because, despite all that she knew about his offenses, she continued to extend such an astounding level of empathy. That Howald can elicit such compassion in such a situation has to tell the Court that his personal history and characteristics extend far beyond his acts that bring him before the Court for sentencing.

The Court is in a unique position having had the opportunity to understand the facts and hear from those who were on-scene and who have known Howald for many years, including Ms. James, whose own history with Howald extends far beyond March 2020.  And the Court also had the opportunity to observe Howald and listen to his testimony. Having heard and seen all of the evidence from trial, the Court also must know that Howald's characteristics are more than the sum of his worst acts and a sentence beyond ten years and one day is greater than necessary.  Russell Howald is not evil but he is indeed very troubled. Howald needs a prolonged period of sobriety and significant mental health support.  A sentence of ten years and a day will ensure both of these needs are met.

The Court is also obliged to impose a sentence taking into consideration Howald's need for vocational and educational training as well as necessary medical care.  The Court may recall that Howald was previously transferred to a BOP medical facility for evaluation.  That evaluation (Dkt. 54) is available to the Court.  Page 8 of that evaluation notes neurologists at the University of Kentucky recommended Howald

for a "fundoscopic evaluation for a possible pseudotumor[1], but that

examination was not completed before Howald left the institution.  The

report also notes Howald reported a persistent noise in his head like a

kettle.  That problem has not resolved, and Howald reports he still

hears the noise.  (Dkt. 54 at 4).   Additionally, during his time with the

BOP for evaluation, Howald requested testing for Von Hippel-Lindau

(VHL), a rare genetic disorder.  Rare though the disease may be, the

letter of Martha Howald indicates that Howald's family has a long

history of the disorder.

 Howald will be requesting the Court recommend placement in one

of the BOP's mid-west facilities, preferably one with ready access to a

medical center, e.g. Sandstone in Minnesota, Oxford, Wisconsin, or

even the Lexington facility in Kentucky.  Aside from medical needs,

Howald's geographic request is to be in close proximity to his

_____

 [1]According to medical sources, a pseudotumor occurs when the pressure inside the skull increases for no obvious reason.  Symptoms can mimic those of a brain tumor and can cause increased intracranial pressure.  That increased pressure can cause swelling of the optic nerve and result in vision loss.
https://www.mayoclinic.org/diseases-conditions/pseudotumor-cerebri/symptoms-causes/syc-20354031

grandmother, Martha, who resides in Missouri.

In addition to his medical needs, Howald has a strong desire to pursue new vocational opportunities.  For his entire life, Howald has been a hard worker.  While the author of the PSR made a valiant attempt to confirm Howald's employment, the nature of his work through the union makes it somewhat difficult.  The majority of Howald's employment is through the 49ers Operating Engineers Union based on Mandan, North Dakota.  Through the union, Howald worked as a crane operator for Norther Industrial Erectors at sites in Minnesota.  There he worked on a project from 2018 through 2020 building "Trinity Hospital."  This was the last job he worked before returning to Basin in 2020.

Howald worked for Berckell and Company out of Bonner Springs, Kansas.  he work there for 8.5 years as a foreman.  He worked for a company called Renegade Construction that installed fiber optic cable throughout Montana and Wyoming.  Also, between 2003 and 2005, Howald work for MRI in Butte operating heavy equipment in the Pit.  Gaps in his resume were filled with self-employment.

Howald is proud of his work history, but recognizes that a prison sentence and advancing age will require him to seek new vocational training to broaden his employment prospects and ensure he can secure work that is less physically taxing. Howald has done research on the facilities suggested above and all have vocational and educational opportunities that appeal to him. The facility in Oxford, Wisconsin, for example has medical facilities with several full-time physicians but also occupational education in culinary arts, welding, plumbing, and waste water treatment.

A sentence of ten years and a day is sufficient but not greater than necessary to provide Howald with necessary health care and it provides more than ample time for Howald to accomplish educational and vocational training necessary for eventual successful reentry.

In addition to promoting educational and vocational training, a sentence of ten years and a day will both protect the public and reduce Howald's risk of reoffending, especially if he can avail himself of RDAP. In its September 2021 report on "Recidivism of Federal Offenders

Released in 2010,"[2] the Sentencing Commission found recidivism decreases the more education an offender has.  If Howald can attain even some college education, his risk of rearrest falls from 50.2% to 37.2 percent.

The Commission also found age and criminal history are "consistently strong predictors of recidivism.  As of the date of sentencing, Howald will be almost one-month shy of his 47th birthday. If he receives the requested sentence, there is a 30.8% chance he will be rearrested.  That percentage is based solely on age.  When combined with the reduced rearrest risk that comes with increased education, the likelihood that Howald will either reoffend or be rearrested drops even further and minimizes any future risk to the community.

Age and education will also provide specific deterrence to Howald. Given the unique nature of hate crimes and the fact that sentences range wildly, it is unlikely that any sentence imposed on Howald will offer general deterrence.  A sentence of ten years and a day, however, will be a just punishment for the facts and circumstances in this case.

---

[2]https://www.ussc.gov/sites/default/files/pdf/research-and-publicati ons/research-publications/2021/20210930_Recidivism.pdf

## Conclusion

Despite the severity of his conduct, Howald has had the good fortune to receive grace and mercy from the members of the community he has called home for many many years.  It is a community to which he has contributed and made a reputation for himself that extends beyond the sum of his criminal acts.  He is fortunate that many of the individuals know him for the whole person that he is and are aware of his all too human failings.  These failings – alcohol and an inability to cope with grief and trauma – are seen far more as the cause of Howald's actions than hate or bigotry.

Even Ms. James does not hold animosity against Howald, and she hopes he can get as much help and counseling as possible.  Ms. Kwasny, who described the effect of Howald's actions, tells the Court that she doesn't "believe that putting someone in prison for decades will solve Howald's problems . . . What I hope is  that the sentence is fair, according to the judge's expertise, and also that [Howald] is given as much support, supervision, and mental health help as possible when he is released and, if possible, a restraining order keeping him from

returning."

On this last point, Howald understands the community's desire and will honor it by not returning to Basin.  However, if the Court wishes to uphold Ms. Kwasny's request, Howald would direct the Court's attention to *United States v. LaCoste*, 821 F.3d 1187 (9th Cir. 2016) (holding it is well settled that a district court can impose a geographic or residency restriction when it is properly supported by the record and substantively reasonable) and *United States v. Many White Horses*, 964 F.3d 825 (9th Cir. 2020)[3].

Howald would simply ask that if the Court was considering such a condition that the Court also consider the restriction as further evidence that a sentence of ten years and one-day is a punishment sufficient but not greater than necessary given all the facts and evidence in this case.

Respectfully submitted this 6th day of June 2023.

 /s/ Colin M. Stephens

[3]The originating case is United States v. Many White Horses, CR 07-63-M-DWM from a judgment on revocation imposed on May 18, 2018.

Colin M. Stephens
STEPHENS BROOKE, P.C.
Attorney for Howald

## <u>CERTIFICATE OF SERVICE</u>

I, Colin M. Stephens, do hereby certify that I delivered a true and correct copy of the foregoing to the following individuals via the means indicated below.

Eric Nelson Peffley . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   CM/ECF
U.S. Dept of Justice

Ethan Plaut . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . CM/ECF
Assistant United States Attorney

Respectfully submitted this 6th day of June 2023.

<u>*/s/Colin M. Stephens*</u>
Colin M. Stephens
Stephens Brooke, P.C.
Attorney for Defendant